IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cr-00199 |
| | ) | |
| BUDDER Y. KHAN, | ) | The Honorable T.S. Ellis, III |
| | ) | |
| Defendant. | ) | Sentencing: February 21, 2020 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, through undersigned counsel and in accordance with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual (the "Guidelines"), hereby provides its position with respect to the sentencing of the defendant, Budder Y. Khan. The government has reviewed the Presentence Investigation Report (the "PSR") and concurs with the findings of the Probation Office, which has correctly calculated Khan's total offense level for his offenses of conviction (*i.e.*, 29) as well as his criminal history category (*i.e.*, VI), the combination of which puts his sentencing range at 151 to 188 months. For the reasons articulated below, the government respectfully recommends that the Court impose a sentence of 151 months on each count of conviction, to run concurrently with one another, and that the Court run 67 of those months concurrently with Khan's undischarged state sentence and 84 months consecutively thereto. In short, the government suggests that adding seven years to Khan's state sentence would be an equitable sanction for his crimes.

**OVERVIEW OF APPLICABLE LAW**

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, "the court shall consider that range as well as

other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.* Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentence disparities. *See* 18 U.S.C. § 3553(a).

Although the Guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citation omitted). Indeed, in the ordinary case, there will be a significant amount of overlap between the Guidelines range and the remaining § 3553(a) factors because the Guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

For example, the Guidelines encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an offense level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflect "the history and characteristics of the defendant" (most notably by establishing a criminal history category based on the defendant's prior criminal record). 18 U.S.C. § 3553(a)(1). The Guidelines further help to prevent "unwarranted sentence disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they are sentenced. *Id.* § 3553(a)(6); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Thus,

although the Guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49.

That Khan, as opposed to the majority of federal defendants at the time of sentencing, is subject to an undischarged term of imprisonment imposed in the state system does not materially alter the Court's sentencing calculus. Indeed, "[j]udges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences . . . that have been imposed in other proceedings, including state proceedings." *Stetser v. United States*, 566 U.S. 231, 236 (2012); *see also* 18 U.S.C. § 3584(a) ("[I]f a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively."); U.S.S.G. § 5G1.3(d) ("In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense."). In making such a determination, the Court must consult the § 3553(a) factors. *See* 18 U.S.C. § 3584(b). Additionally, the Court should take into account considerations such as the type and length of, and time served on, the prior undischarged sentence. *See* U.S.S.G. § 5G1.3, application note 4(A).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because the government agrees with the description of the offenses as set forth in the PSR, all of the pertinent facts will not be recounted here. The government does, however, summarize the defendant's criminal conduct as well as relevant events that postdated it.

On July 14, 2014, Khan and another individual entered Route 50 Gold and Jewelry Exchange (hereinafter, "Route 50"), a pawn shop located in Falls Church, Virginia, where they forced the individuals working at the store that day to the floor using what appeared to be but was not actually a real firearm.  Thereafter, Khan and the other individual smashed the business's glass display cases and took from them items of jewelry and watches worth more than $650,000, some of which Khan later sold.

On April 22, 2015, Khan and a different individual entered Top Pawn, another pawn shop located in Falls Church, where they employed the same modus operandi that was used during the Route 50 robbery, which is to say that they used what appeared to be but was not actually a real firearm to force the individuals working at the store that day into submission before smashing the business's glass display cases.  Again, items of jewelry and watches were taken from the display cases, the value of which this time was over $143,000.  In addition, Khan and his partner took approximately $1,000 in cash belonging to Top Pawn.  Later, Khan sold some of the stolen items.

On June 27, 2019, a federal grand jury sitting in the Eastern District of Virginia returned an indictment charging Khan with two counts each of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951(a) and 2.  Docket Entry ("DE") 1.  At the time he was indicted, Khan was in the custody of the Virginia Department of Corrections, serving an 18-year sentence for a series of bank robberies that postdated the aforementioned pawn shop robberies.[1]  Thereafter, pursuant to a writ of habeas

---

[1] Specifically, Khan robbed a SunTrust bank in Alexandria, Virginia, on April 18, 2016, a Wells Fargo bank in Alexandria on April 28, 2016, and a Wells Fargo bank in Arlington, Virginia, on May 11, 2016.  Khan was not convicted of any firearm offenses in connection with those bank robberies.

corpus ad prosequendum, Khan was brought to this District where he made his initial appearance on July 23, 2019.  DEs 6, 8.

On September 5, 2019, Khan pled guilty to Counts 2 and 4 of the indictment, each of which charged him with Hobbs Act robbery, in violation of 18 U.S.C. §§ 1959(a) and 2.  DEs 14–16.  The Court dismissed without prejudice Counts 1 and 3 upon motion of the government, which had agreed to so move in exchange for Khan's guilty pleas.  DEs 17, 18.

## APPLICATION OF THE § 3553(a) FACTORS

Khan stands convicted of very serious offenses.  The robberies he perpetrated manifestly debilitated the businesses that he targeted (not to mention their insurers), and the other victims of his crimes—that is, the four clerks who had the misfortune of being in the wrong place at the wrong time—surely suffered psychological trauma even if they were not physically harmed.  Khan might say, by way of extenuation, that he committed the robberies not out of greed but rather to feed his heroin addiction.  And he might further contend that because he only used a blank-firing gun, there was no actual risk of anybody being seriously hurt.  On both scores, however, Khan would be gravely mistaken.  While the government does not question that Khan was addicted to heroin or that the grip of his habit was intense, his drug dependence does not vitiate the callousness of his conduct.  Nor does it dilute the dangerousness that inheres when masked intruders like Khan, seemingly armed with a semi-automatic handgun, storm into a business.  Even if Khan was not armed with a real firearm, his victims could not have known that and undoubtedly assumed otherwise.  As a result, they feared for their lives.  What is more, when Khan entered the pawn shops, he had no way of knowing if those soon-to-be victims were themselves armed with firearms.  Had they been, everybody's life would have been at risk.

A stiff sanction here is warranted not just on the basis of the nature and circumstances of Khan's offenses but also in light of his personal history and characteristics. As the PSR catalogues in detail, Khan has, until his present incarceration, largely led a life of crime. Indeed, Khan has been convicted of at least one crime nearly every year of his adult life that he has not been in prison, and that follows an adolescence marred by a multitude of juvenile infractions and associations with various street gangs. While there is never an excuse for committing violent crimes, Khan's case is particularly confounding given that he grew up in a middle-class neighborhood in Northern Virginia, claims not to have suffered any form of abuse, has never endured any serious injuries, illnesses, or psychological afflictions, is highly intelligent, and has a demonstrated ability to secure gainful employment. Besides his substantial history of drug abuse, therefore, there is little in his background that even comes close to mitigating the severity of his crimes.

Based on Khan's track record and the nature of his crimes, it is clear that he needs to be deterred from continuing his life of crime when he is eventually released from custody. In another case, that same imperative might counsel in favor of an even heftier sentence. But here, Khan is in the atypical position of having over a decade left to spend in state prison irrespective of the federal consequences of the pawn shop robberies. Thus, while the need for specific deterrence is certainly present, it is proper for the Court's consideration of that factor in formulating a fair judgment to be informed by the duration of the sentence that Khan is already serving.

Lastly, the Court must consider the need to avoid *unwarrante*d sentence disparities. In this regard, the government expects Khan to point to the sentence of probation that the Court imposed upon Mary Phothong, Khan's former girlfriend who pled guilty to offenses in

connection with the same two pawn shop robberies. In the government's view, Phothong's sentence is hardly a relevant data point. Indeed, in virtually every respect, Phothong's case is distinguishable from Khan's.

For one thing, whereas Khan was one of the robbers who actually entered the pawn shops, terrorized the clerks, smashed the display cases, and stole the valuables, and as a result has pled guilty to two counts of substantive Hobbs Act robbery, Phothong only served as a getaway driver for the Route 50 robbery and helped Khan elude apprehension following the Top Paw robbery by renting him a hotel room, resulting in her guilty pleas to conspiracy to commit Hobbs Act robbery and accessory after the fact. Moreover, whereas Khan is literally a career offender, putting him in criminal history category VI, Phothong was in criminal history category III based on convictions that, while not insubstantial, stemmed almost exclusively from her history of drug abuse. Finally, when they committed their respective crimes in 2014 and 2015, Phothong and Khan were in a relationship, one that, by all accounts except for Khan's, was abusive, toxic, and at times violent. It is therefore not a stretch to say that Phothong was under Khan's thumb. Because Phothong and Khan do not have similar records, have not been convicted of similar conduct, and are not similarly situated, a sentence disparity between them is warranted.

Ultimately, based on the factors set forth in § 3553(a), the government believes that a sentence at the low end of Khan's Guidelines range is sufficient to satisfy the ends of sentencing.

## CONCLUSION

The government recommends that the Court sentence Khan to 151 months (with credit for time served as calculated by the Bureau of Prisons) on each of Counts 2 and 4 to run concurrently with one another. The government further recommends that the Court, in the

judgment of conviction that it enters, make clear that those 151 months shall run concurrently with Khan's state sentence until the earlier of either (a) the date on which the state sentence is discharged, or (b) the date on which 67 months have passed from the date on which Khan re-enters the custody of the Virginia Department of Corrections following sentencing in this Court, at which point the remainder of the 151 months shall be served consecutively to Khan's state sentence.[2]  Such a sentence is sufficient and not greater than necessary to accomplish the sentencing objectives identified in § 3553(a).  Finally, the government requests that the Court impose a total term of supervised release of three years and enter a restitution order obligating Khan, on a joint-and-several basis with Mary Phothong, to repay the pawn shops and their insurers the $797, 268.95 in losses that they suffered.

        Respectfully submitted,

        G. Zachary Terwilliger
        United States Attorney

By:     /s/
        Alexander E. Blanchard
        Assistant United States Attorney
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        Tel: (703) 299-3700
        Fax: (703) 299-3980
        alexander.blanchard@usdoj.gov

---

[2] Khan's projected release date is January 9, 2034.  The Commonwealth of Virginia long ago abolished parole, except in narrow circumstances that do not appear to apply here, and the government has no reason to believe that Khan's release date will change dramatically.  Nevertheless, the government has couched its recommendation in this somewhat cumbersome manner to account for the possibility, as remote as it might be, that Khan's state sentence could be reduced to some period less than 67 months.  In that scenario, the government's position is that Khan should be required to serve not just 84 months in the custody of the Bureau of Prisons but rather the difference between 151 months and however many months fewer than 67 he ended up serving in the state.

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2020, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record. I further certify that on February 14, 2020, I sent a copy of the foregoing to the Probation Officer assigned to this matter:

Kenneth G. Orsino
U.S. Probation Officer
Eastern District of Virginia
Kenneth_Orsino@vaep.uscourts.gov

/s/
Alexander E. Blanchard
Assistant United States Attorney